**STATE of Utah, Plaintiff and Appellee,**

v.

**Keith MINCY, Defendant and Appellant.**

No. 910190–CA.

Court of Appeals of Utah.

July 22, 1992.

Certiorari Denied Oct. 20, 1992.

Hans M. Scheffler, Salt Lake City, for defendant and appellant.

R. Paul Van Dam and Todd A. Utzinger, Salt Lake City, for plaintiff and appellee.

Before BENCH, GREENWOOD and ORME, JJ.

GREENWOOD, Judge:

Defendant Keith Mincy appeals his conviction of second degree murder, a first degree felony, in violation of Utah Code Annotated section 76–5–203 (1990). We affirm.

## BACKGROUND

At about 1:30 a.m. on September 23, 1990, defendant and two friends were standing beside defendant's parked car, a 1981 black Suzuki Sidekick, listening to music and visiting outside Club DV8, a dance club in Salt Lake City. Lorenzo Thompson and two of his friends drove up and parked in front of defendant's car. Thompson remained in the driver's seat while his friends got out of the car to see if the club was still open. Thompson's car began rolling backward and almost hit defendant's car. When one of defendant's friends yelled out to warn Thompson, Thompson responded that he did not care if he hit defendant's car because it was only worth $7000 and he had more money than that in his pocket. An argument ensued between the two groups during which Thompson got out of his car, hit defendant's friend, and then jumped on defendant. Thompson repeatedly pounded defendant's head into the street while threatening to kill him. Thompson's two friends began fighting with defendant's two friends. Thompson was stabbed with a knife during the incident and died after his friends took him to Holy Cross Hospital.

Detective Johnson, a homicide detective for the Salt Lake City Police Department, spoke with two eyewitnesses, Melinda Clarkson and Laura Cade. They told Johnson that three men, all of whom were black, were involved in the altercation with Thompson and his friends. They did not know any of the men's names but said that the man who stabbed Thompson was between five feet nine inches and five feet eleven inches, with a medium build, a large nose and a bowl haircut. They also said he drove a black Suzuki and worked at Hill Air Force Base.

Based on this information, Johnson located defendant at Hill Air Force Base and conducted three pre-arrest interviews with him. The first interview took place at Hill Air Force Base, the second and third at the Salt Lake City Police Station.

The day after the incident, Clarkson and Cade went to the police station and viewed defendant and the two friends he was with during the fight. Both witnesses identified defendant as the one who stabbed Thompson. Later, another eyewitness, Michael Springer, identified defendant as the assailant from a photo spread.

Defendant was arrested and charged with second degree murder. Before trial, defendant filed a motion to suppress statements he made to police during the three pre-arrest interviews on the basis that the interviews violated his right to counsel. He also moved the court to suppress evidence of Clarkson's and Cade's identification of him at the police station because he claimed the procedure was a lineup and he was not advised of his right to have counsel present. Additionally, he argued Springer's identification of him should be suppressed because the photo spread was unduly suggestive. The trial court denied the motion to suppress in its entirety. In its findings of fact and conclusions of law, the court found that the first two pre-arrest interviews were not custodial interrogations and defendant therefore did not have the right to have counsel present. It found that the third interview was custodial, but that defendant had waived his right to counsel. Additionally, the court found that the in-person identification procedure at the police station was a showup, rather than a lineup, and therefore defendant did not have the right to have counsel present. It also found the photo spread was not unduly suggestive.

A jury convicted defendant of second degree murder. Following his conviction, but prior to sentencing, defendant made a post-conviction motion requesting the court to

set aside the conviction and impose a sentence for the next lower category of offense. The trial court denied the motion and sentenced defendant to five years to life at the Utah State Prison. This appeal followed.

## ISSUES

On appeal, defendant argues the trial court erred in: (1) denying his motion to suppress his pre-arrest statements to police; (2) denying his motion to suppress the witness identification of him at the police station because the procedure violated his right to counsel; (3) denying his motion to suppress Clarkson's identification of him at the police station because it was unreliable; (4) failing to instruct the jury on the lesser included offense of negligent homicide; and (5) denying his post-conviction motion.[1]

## MOTION TO SUPPRESS

■ Defendant contends the trial court erred in denying his motion to suppress statements he made to police during three pre-arrest interviews. He argues that the interviews were custodial interrogations and because he was not advised of his right to counsel, admission of statements he made during the interviews violated his right to counsel under the Sixth Amendment to the United States Constitution and Article I, Section 12 of the Utah Constitution.[2]

■ In reviewing a trial court's ruling on a motion to suppress, this court will not disturb the factual findings underlying the ruling unless they are clearly erroneous. *State v. Morck*, 821 P.2d 1190, 1192 (Utah App.1991). In assessing the trial court's legal conclusions, however, this court ap-

plies a correction of error standard of review. *Id.*

■ "[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966). Such procedural safeguards include advising the defendant of his or her right to have an attorney present. *Id.*

■ The United States Supreme Court has defined "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* "[T]he ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983) (per curiam) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977)). The determination of whether an interrogation was custodial is to be made objectively. "[T]he only relevant inquiry is how a reasonable [person] in the suspect's position would have understood his situation." *Berkemer v. McCarty*, 468 U.S. 420, 442, 104 S.Ct. 3138, 3151, 82 L.Ed.2d 317 (1984).

■ This court and the Utah Supreme Court have identified five factors to consider in determining whether a defendant "who has not been formally arrested is in custody." *Salt Lake City v. Carner*, 664

---

1. Additionally, defendant argues that the photo spread was unduly suggestive. We decline to address this issue because he has failed to provide any legal analysis or cite any authority in support of this claim. *State v. Amicone*, 689 P.2d 1341, 1344 (Utah 1984). Defendant also alleges that the evidence was insufficient to support his conviction. We decline to address this issue because defendant has failed to marshal the evidence. *See State v. Moore*, 802 P.2d 732, 738–39 (Utah App.1990) ("If the appellant fails to ... marshal the evidence, the appellate court

need not consider the challenge to its sufficiency.").

2. Defendant has failed to provide a separate analysis under the Utah Constitution. We therefore consider his right to counsel claim under the United States Constitution only. *State v. Lafferty*, 749 P.2d 1239, 1247 n. 5 (Utah 1988), *cert. denied*, —— U.S. ——, 112 S.Ct. 1942, 118 L.Ed.2d 548 (1992); *State v. Bobo*, 803 P.2d 1268, 1272 (Utah App.1990).

P.2d 1168, 1171 (Utah 1983). They are " '(1) the site of interrogation; (2) whether the investigation focused on the accused; (3) whether the objective indicia of arrest were present; . . . (4) the length and form of interrogation'; and (5) whether the defendant came to the place of interrogation freely and willingly." *State v. Sampson,* 808 P.2d 1100, 1105 (Utah App.1990) (quoting *Carner,* 664 P.2d at 1171), *cert. denied,* 817 P.2d 327 (Utah 1991), *cert. denied,* — U.S. ——, 112 S.Ct. 1282, 117 L.Ed.2d 507 (1992). The fifth criterion included in *Sampson* was adopted from *State v. Herrera,* 49 Or.App. 1075, 621 P.2d 1209, 1212 (1980).

■ Utah courts also place "a great deal of emphasis on the form of the questioning" used in the interview. *Sampson,* 808 P.2d at 1105. If the questioning is merely investigatory, courts have not found custody. *Id.* "However, when investigatory questioning shifts to accusatory questioning, custody is likely and *Miranda* warnings become necessary." *Id.* "The change from investigatory to accusatory questioning occurs when the 'police have reasonable grounds to believe that a crime has been committed and also reasonable grounds to believe that the defendant committed it.' " *Id.* at 1105–06 (quoting *Carner,* 664 P.2d at 1171).

### A. Questioning at Hill Air Force Base

■ The first time police questioned defendant was at Hill Air Force Base (Hill), the morning after the fight. After receiving a description of the man who stabbed Thompson from eyewitnesses Clarkson and Cade, Detective Johnson called Hill security police and inquired whether a man fitting the description was stationed there. In response to Johnson's call, Hill security police went to defendant's residence and took him to the security office. Johnson and another detective drove to Hill and interviewed defendant. Defendant testified that he did not answer any of the questions, but instead, told Johnson that he would like some legal advice before he spoke with them. Johnson testified that defendant did not ask for legal advice and admitted he drove a black Suzuki Sidekick and had been in Salt Lake the night before, but that he could not remember who he was with or where they went. Johnson also testified that defendant said he was not involved in a fight. Defendant asked if he was under arrest and when the officers told him he was not, defendant left.

The interview took place in a partitioned office at the Hill security police office. Defendant was not under arrest, nor was he handcuffed or read his *Miranda* rights. The interview lasted about five minutes and the questions were investigatory, rather than accusatory in nature. The trial court found:

> Neither officer brandished a weapon or in any way indicated to defendant that he was under arrest or in custody.... [Defendant] was at all times free to leave and in fact did elect to do so after a brief period of questioning. No attempt was made by any party to dissuade or stop defendant from leaving the security office, and defendant was expressly informed that he was not under arrest.

We find that under the *Carner* and *Sampson* factors, this interview was not a custodial interrogation and therefore, defendant did not have the right to have counsel present.

### B. Questioning at the Salt Lake City Police Station

■ About thirty minutes after the interview at Hill, defendant telephoned the Salt Lake City Police Station and asked to speak with Detective Johnson. Johnson was not in, but returned defendant's call when he arrived. Defendant told Johnson he had been involved in the fight and agreed to come to the Salt Lake City Police Station and talk again with Johnson. At Johnson's request, defendant brought the two friends he had been with during the fight. When the three men arrived at the station, they were put in separate rooms on the sixth floor. Johnson questioned defendant about the fight and recorded the interview. Defendant was not under arrest or handcuffed and was not read his *Miranda* rights.

In concluding that this interview was not custodial, the trial court found:

> Although defendant was interviewed in a closed interrogation room and the conversation was recorded, there is nothing to indicate that the setting was oppressive or that defendant's movement was restricted. Defendant was not handcuffed, shackled or physically restrained. Defendant was not under arrest, nor was he told that he was under arrest.
>
> Defendant was allowed to use the restroom and to get a drink of water. Johnson apparently accompanied defendant to the bathroom for security reasons, but defendant was not in custody and remained free to leave the station. Defendant was never told that he was not free to leave the station.

The trial court's findings supporting the determination that this was not a custodial interrogation are not clearly erroneous. The matter was still in the investigatory stage. The detectives knew the three men were involved in the fight but they did not know at that point which of them had most likely stabbed Thompson. Defendant was neither under arrest nor had police read him his *Miranda* rights. Defendant went voluntarily to the police station and initiated the interview by calling Johnson. We find that in applying the *Carner* and *Sampson* factors, the trial court correctly concluded that this was not a custodial interrogation.

■ Following the interview, Johnson took defendant and his friends to another room to determine if Clarkson and Cade could identify which of them stabbed Thompson. Both women identified defendant. After the identification procedure, Johnson again put defendant and his friends in separate rooms for more questioning. Johnson locked defendant in an interrogation room, read him his *Miranda* rights, and further questioned him. Following the interview, Johnson placed defendant under arrest.

The trial court found that this was a custodial interrogation but that defendant knowingly and intelligently waived his right to have counsel present. The court stated that defendant was "at that point in custody for *Miranda* purposes and would not have been allowed to leave the station had he desired to do so." The trial court also found that "[d]efendant indicated that he understood his rights and knowingly waived his rights. Defendant agreed to speak with Johnson without an attorney being present. The conversation that followed was an interrogation for *Miranda* purposes and, as noted above, defendant was in custody."

We conclude that the trial court's findings are not clearly erroneous. The site of the questioning was a locked interrogation room at the Salt Lake City Police Station. Defendant had been identified by two eyewitnesses as the man who stabbed Thompson. He was not free to leave and the questioning was accusatory in nature. We agree with the trial court that this was a custodial interrogation but that defendant knowingly and voluntarily waived his *Miranda* rights, including the right to have counsel present.

The interview at Hill and the first interview at the police station were not custodial, and defendant therefore did not have the right to have counsel present. The second interview at the police station was custodial, but defendant waived his right to have counsel present. We therefore conclude that the trial court did not err in denying defendant's motion to suppress statements made by him to police during the three pre-arrest interviews.

## RIGHT TO COUNSEL DURING THE IDENTIFICATION PROCEDURE AT THE POLICE STATION

Defendant argues that the eyewitness identification procedure conducted at the police station violated his right to counsel under the Sixth Amendment to the Federal Constitution and Article I, Section 12 of the Utah Constitution.[3] Defendant claims there-

---

**3.** Defendant has failed to provide a separate analysis under the Utah Constitution. We therefore consider his identification procedure claim

procedure was a lineup and that he was not advised of his right to have counsel present. The State contends that the procedure was a showup and that defendant did not have the right to have counsel present.

■■■ The Sixth Amendment guarantees the right to have counsel present at identification procedures conducted "at or after the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Kirby v. Illinois*, 406 U.S. 682, 689, 92 S.Ct. 1877, 1882, 32 L.Ed.2d 411 (1972). *See also Moore v. Illinois*, 434 U.S. 220, 227–28, 229, 232, 98 S.Ct. 458, 464–66 (1977), *cert. denied*, 440 U.S. 919, 99 S.Ct. 1242, 59 L.Ed.2d 471 (1979). The identification procedure in the present case occurred before criminal proceedings were initiated against defendant because he had not yet been arrested or charged with any crime. Therefore, under the Sixth Amendment, defendant did not have the right to counsel at the identification procedure.

■■■ Utah statutory law, however, provides that "[a] suspect has the right to have his attorney present at *any lineup*." Utah Code Ann. § 77–8–2 (1990) (emphasis added). The statute does not differentiate between lineups that are conducted before and those that are conducted after adversary judicial criminal proceedings are initiated against the suspect. Also, the statute refers only to lineups, not to showups. Therefore, under the Utah Code, one has the right to counsel during any lineup, regardless of when it is conducted. Utah Code Ann. § 77–8–2 (1990). Utah cases, however, have not required the right to request counsel in identification procedures described as "showups" rather than lineups. *State v. Poteet*, 692 P.2d 760, 763 (Utah 1984).

Utah case law does not clearly define the difference between lineup and showup procedures. The distinction appears to be fact sensitive and dependent on the context of the procedure. Utah Supreme Court cases indicate that factors such as time, number of participants, location and nature of the proceeding are all relevant in determining whether an identification procedure is a lineup or a showup. *Poteet*, 692 P.2d at 760, 763; *State v. Allen*, 29 Utah 2d 442, 511 P.2d 159, 160 (1973); *State v. McGee*, 24 Utah 2d 396, 473 P.2d 388, 391–92 (1970). Lineups typically include several individuals similar in appearance to the suspect. They usually take place at a police station a substantial time after the crime is committed. Lineups are generally conducted in order to test an eyewitness's ability to identify the suspect from a random group chosen for physical similarities to the suspect, some time after the crime.

■■■ Showups, on the other hand, typically take place soon after the crime is committed, usually at the scene of the crime or where the suspect is apprehended. The purpose of a showup is so the victim or witness can immediately identify whether the person the police has in custody is actually the one who committed the crime. The determinative factor between lineups and showups however, is the stage of the investigation and prosecution at which the procedure occurs. If the police are still in the investigatory stage, trying to identify a suspect, the identification procedure is most likely a showup. If, however, the police are in the prosecutorial stage, testing the reliability of a witness in identifying a perpetrator, the procedure is most likely a lineup.

In *Allen*, the court held that the following out-of-court identification procedure was not a lineup. Ten to fifteen minutes after a robbery occurred, the two victims traveled less than one block to the place where police had apprehended defendant and identified him as one of the men who had committed the crime. Defendant appealed his conviction, claiming the trial court erred in failing to suppress the identification on the basis that it was a lineup and that he had not been advised of his right to have counsel present. The court determined, however, that this was not a lineup. *Allen*, 511 P.2d at 160. The court analogized the procedure to the one that

under the Federal Constitution and Utah statutory law only.

occurred in *McGee*, where a witness to a larceny went to the police station fifteen to twenty minutes after the crime and identified defendant as the thief. Defendant moved to dismiss the charge on the ground that he had been identified in a lineup without being advised of his right to counsel. The court rejected the argument, holding that the procedure was not a lineup. *McGee*, 473 P.2d at 392.

In *Poteet*, the court found the following identification procedure to be a showup rather than a lineup. The victim of an aggravated assault at a motel told police that the "Poteet brothers" had beaten him. The police went to the Poteet home and told the four Poteet brothers they had been accused of the crime. They denied the accusation and an officer told them, "the only way I'm going to clear this up, if you want to clear this up, is if you want to go up to the motel with me and see if he can identify you." They agreed to go. The officer lined them up along a chain link fence and the victim identified three of them as his assailants. On appeal, one defendant claimed the identification procedure was a lineup and that he was denied the right to have his attorney present. In finding it was not a lineup, the court stated that "[t]he officer's actions were merely to confirm which of the Poteets Jones was accusing." *Poteet*, 692 P.2d at 763. The court cited *State v. Bush*, 109 Ariz. 487, 512 P.2d 1221 (1973), where the Arizona Supreme Court held that a similar identification procedure was a showup rather than a lineup because it " 'served merely to confirm to the police that the man they had apprehended was the same man [the victim] was accusing of [committing the crime].' " *Poteet*, 692 P.2d at 763 (quoting *Bush*, 512 P.2d at 1224).

■ In the present case, the police had not yet focused the investigation on defen-dant alone when they conducted the identification procedure. They knew the three men had been involved in the fight and conducted the procedure to determine which one actually stabbed Thompson. We therefore conclude that the procedure was a showup, and accordingly, defendant did not have the right to have counsel present.

## RELIABILITY OF CLARKSON'S IDENTIFICATION OF DEFENDANT AT THE POLICE STATION

■ Defendant argues that evidence of the eyewitness identification procedure at the police station should have been suppressed by the trial court because it was unreliable and the procedure was unduly suggestive. He contends that admission of such evidence violated his right to due process under the Fourteenth Amendment to the Federal Constitution and Article I, Section 7 of the Utah Constitution.[4]

Defendant claims the identification procedure was unnecessarily suggestive because only three people were presented for the witnesses to view, they were all different heights, with different hair styles, and different body types, and the witnesses were together when they viewed the suspects and made their identifications. He also argues that Clarkson's identification is unreliable because of a conversation she had with Cade before the procedure. Immediately following the crime, Clarkson told police that the assailant was wearing a floral shirt, shorts and "could have been" someone with whom she went to school. Later, Cade told Clarkson that she must be mistaken because the assailant did not go to school with her but worked at Hill Air Force Base. Defendant also argues that Clarkson's identification is not reliable because there were three fights going on before the stabbing occurred, all of which Clarkson was watching, and she therefore

---

**4.** The State urges this court not to consider defendant's argument regarding identification reliability under the state constitution because he did not provide a separate state constitutional analysis of this issue before the trial court. Defendant's trial occurred, however, prior to the supreme court's decision in *State v. Ramirez*, 817 P.2d 774 (Utah 1991), which set forth for the first time an independent analysis under the Utah Constitution for out-of-court eyewitness identification procedures. Because a separate analysis did not exist at the time of defendant's trial, we will consider this issue under both the Federal and Utah Constitutions. *See State v. Sims*, 808 P.2d 141, 150 (Utah App.), *cert. filed*, 167 Utah Adv. Rep. 25 (1991).

could not have sufficiently focused her attention on defendant to accurately identify him later. Clarkson and Cade were together when they viewed the suspects and both identified defendant as the stabber. Clarkson testified at trial regarding the identification. Cade did not testify at trial.

Because we have decided the identification procedure was a showup, we need not consider defendant's allegations concerning the differences in the men's appearances and the number of people viewed by the witnesses as not conforming with due process requirements for lineup procedures. We do, however, consider defendant's contention that Clarkson's identification is unreliable.

 The constitutionality of an identification procedure is a mixed question of law and fact. *Sumner v. Mata*, 455 U.S. 591, 597, 102 S.Ct. 1303, 1306, 71 L.Ed.2d 480 (1982); *State v. Ramirez*, 817 P.2d 774, 781 (Utah 1991). The trial court's conclusion that defendant's due process rights were not violated is reviewed without deference to the trial court. *Archuleta v. Kerby*, 864 F.2d 709, 711 (10th Cir.1989), *cert. denied*, 490 U.S. 1084, 109 S.Ct. 2108, 104 L.Ed.2d 669 (1989); *Ramirez*, 817 P.2d at 782. The factual findings underlying the conclusion are, however, entitled to a presumption of correctness. *Archuleta*, 864 F.2d at 711; *Ramirez*, 817 P.2d at 782.

 We apply separate analyses when determining the reliability of eyewitness identifications under the Utah and Federal Constitutions. *Ramirez*, 817 P.2d at 779. Under the Federal Constitution, we apply a two-step test. *Archuleta*, 864 F.2d at 711. First, we must determine whether the identification procedure was unnecessarily suggestive so as to give rise to the possibility of irreparable misidentification. *Neil v. Biggers*, 409 U.S. 188, 198–200, 93 S.Ct. 375, 381–82, 34 L.Ed.2d 401 (1972); *Simmons v. United States*, 390 U.S. 377, 383–84, 88 S.Ct. 967, 970–71, 19 L.Ed.2d 1247 (1968); *Stovall v. Denno*, 388 U.S. 293, 302, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199 (1967).

 Second, we must determine "whether under the totality of the circum-stances, the identification was reliable." *Biggers*, 409 U.S. at 199, 93 S.Ct. at 382; *see also Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977). The Supreme Court set forth the following five factors to consider when evaluating the reliability of an out-of-court identification procedure under the Federal Constitution:

> [T]he opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

*Biggers*, 409 U.S. at 199–200, 93 S.Ct. at 382 (1972). "The court must balance these five factors against the 'corruptive effect' of the identification procedures in order to determine whether the identification testimony should have been suppressed." *Archuleta*, 864 F.2d at 711 (quoting *Manson*, 432 U.S. at 114, 97 S.Ct. at 2253).

 Applying the *Biggers* factors to the facts of this case, we find that the identification procedure was not unnecessarily suggestive. Because our review of the record is consistent, we defer to the trial court's finding that "[t]here was nothing present to focus [the witnesses'] attention on the defendant (i.e. he was not shackled, handcuffed or otherwise ... distinguishable from the other two men)." We also conclude that the procedure was reliable under the totality of the circumstances. Clarkson saw the suspect from a distance of fifteen to fifty feet for ten to fifteen minutes during the events leading up to the stabbing. She viewed him from several angles and was close enough to hear verbal exchanges between defendant and his friends and the victim. The street was well-lit by street lights and Clarkson's attention was focused on the events. Although Clarkson also watched the other fights and testified that she did not see the victim on top of defendant in the street, she provided a detailed account of how defendant reached into his pocket, withdrew his knife, lunged toward the victim and stabbed him. Of the five *Biggers* factors,

it is the third upon which defendant most heavily relies in making his argument. Defendant claims Clarkson's original description of him as possibly wearing shorts and being someone with whom she may have gone to school, makes her identification unreliable because defendant was not, in fact, wearing shorts and did not attend her school. Clarkson did, however, accurately describe defendant's floral shirt, haircut, build and distinctive nose. Upon first viewing defendant and his two friends at the police station, Clarkson positively identified defendant as the person who stabbed the victim. The identification took place approximately fourteen hours after the crime was committed.

We conclude that defendant's due process rights under the Federal Constitution were not violated by admission at trial of evidence concerning Clarkson's identification of defendant because it was not under unnecessarily suggestive circumstances and was sufficiently reliable.

▪ Under the Utah constitutional analysis, "[t]he ultimate question to be determined is whether, under the totality of the circumstances, the identification was reliable." *Ramirez*, 817 P.2d at 781. We consider the following five factors in making this determination:

(1) [T]he opportunity of the witness to view the actor during the event; (2) the witness's degree of attention to the actor at the time of the event; (3) the witness's capacity to observe the event, including his or her physical and mental acuity; (4) whether the witness's identification was made spontaneously and remained consistent thereafter, or whether it was the product of suggestion; and (5) the nature of the event being observed and the likelihood that the witness would perceive, remember and relate it correctly. This last area includes such factors as whether the event was an ordinary one in the mind of the observer during the time it was observed, and whether the race of the actor was the same as the observer's.

*Id.* at 781 (quoting *State v. Long*, 721 P.2d 483, 493 (Utah 1986)).

▪ Of the five *Long/Ramirez* factors, the fourth is the one upon which defendant challenges the reliability of Clarkson's identification. However, there is nothing in the record to indicate that Cade suggested to Clarkson which of the three was the stabber or tried to change Clarkson's mind about which one stabbed the victim. She merely told Clarkson that the man who stabbed the victim worked at Hill and was not a student. Clarkson had not identified anyone prior to the police station procedure or her conversation with Cade and she never identified anyone other than defendant. The trial court found that the "[p]olice employed adequate precautions to insure that Cade and Clarkson acted independently in making their identifications."

▪ Also, under Utah law, the difference between Clarkson's original description of defendant to police and defendant's actual appearance bears on her credibility and on the weight the jurors may give her testimony, but does not alone make her identification inadmissible. *State v. Nebeker*, 657 P.2d 1359, 1362 (Utah 1983).

Applying the *Long/Ramirez* factors to the facts of this case, we conclude that Clarkson's identification was reliable under the totality of the circumstances and did not violate defendant's due process rights under the Utah Constitution.

## NEGLIGENT HOMICIDE INSTRUCTION

▪ Defendant argues the trial court erred in refusing to instruct the jury on the lesser included offense of negligent homicide.[5] An appeal of the trial court's refusal to give a jury instruction presents a question of law. *State v. James*, 819 P.2d 781, 798 (Utah 1991) (citation omitted). We therefore review the trial court's ruling under a correction of error standard, granting it no particular deference. *Id.*

The trial court must give a lesser included offense instruction if "the evidence is

---

5. Negligent homicide, as codified in Utah Code Annotated section 76–5–206 (1990) provides:

Criminal homicide constitutes negligent homicide if the actor, acting with criminal negligence, causes the death of another.

ambiguous and susceptible to alternative explanations ... [and] if any one of the alternative interpretations provides both a rational basis for the verdict acquitting the defendant of the offense charged and convicting him of the included offense." *State v. Velarde*, 734 P.2d 449, 451 (Utah 1986).

██ If the trial court's refusal to instruct the jury on the lesser included offense of negligent homicide constituted error, we conclude the error was harmless. The trial court instructed the jury on the lesser included offense of manslaughter.[6] Manslaughter requires a higher degree of intent than does criminal negligence, but less than does murder. Criminal negligence is a lesser included offense of manslaughter. *State v. Day*, 815 P.2d 1345, 1348 (Utah App.1991). Despite having the option of convicting defendant of manslaughter, the jury convicted defendant of the more serious offense of second degree murder. It is therefore not possible the jury would have found him guilty of negligent homicide had they received the instruction. *See State v. Standiford*, 769 P.2d 254, 267 (Utah 1988) (harmless error to not instruct jury on negligent homicide when it received manslaughter instruction and convicted defendant of second degree murder).

## POST–TRIAL MOTION

██ Following defendant's conviction, he filed a motion pursuant to Utah Code Annotated sections 76–1–402(5)[7] and 76–3–402(1)[8], in which he moved the trial court to set aside his conviction and impose a sentence for the next lower category of offense. He argued imposition of a lower sentence was justified given the different versions of the incident presented and because Thompson was the aggressor. The trial court denied the motion.

In denying the post conviction motions, the trial court stated:

What happened was unintentional in that I don't think you set out that evening to commit the crime that was committed.... But what occurred was—is not entirely out of the realm of possibility because you carried a weapon with you and you must have had some intention for doing that, not that you intended to use it, but the fact is that when it came time to defend yourself, you had a weapon and the evidence was clear in my judgment that what you did was intentional. You intended to use that knife and unfortunately the result was the death of another person.

Now, this court cannot substitute its judgment for the judgment of the jury. Those issues were fairly presented to the jury and they made findings of fact that I can't substitute for, I can't change the facts as they were found by the jury. I

---

**6.** Manslaughter is codified at Utah Code Annotated section 76–5–205 (1990) and states:

(1) Criminal homicide constitutes manslaughter if the actor:

(a) recklessly caused the death of another; or

(b) causes the death of another under the influence of extreme emotional disturbance for which there is a reasonable explanation or excuse, or

(c) causes the death of another under circumstances where the actor reasonably believes the circumstances provided a legal justification or excuse for his conduct although the conduct is not legally justifiable or excusable under the existing circumstances.

**7.** Section 76–1–402(5) (1990) states:

If the district court on motion after verdict or judgment, or an appellate court on appeal or certiorari, shall determine that there is insufficient evidence to support a conviction for the offense charged but that there is sufficient evidence to support a conviction for an in-

cluded offense and the trier of fact necessarily found every fact required for conviction of that included offense, the verdict or judgment of conviction may be set aside or reversed and a judgment of conviction entered for the included offense, without necessity of a new trial, if such relief is sought by the defendant.

**8.** Section 76–3–402(1) (1990) states:

If the court, having regard to the nature and circumstances of the offense of which the defendant was found guilty and to the history and character of the defendant, concludes that it would be unduly harsh to record the conviction as being for that category of offense established by statute and to sentence the defendant to an alternative normally applicable to that offense, the court may, unless otherwise specifically provided by law, enter a judgment of conviction for the next lower category of offense and impose sentence accordingly.

think that the evidence is clear that it was sufficient and the jury was justified in making the ruling and finding of fact and judgment and the verdict that they returned. It was based on the facts and the evidence.

Defendant argues that because the trial court stated it believed defendant did not "set out that evening to commit the crime that was committed," it erred in not granting defendant's post-conviction motion.

■ "Questions of intent are strictly within the province of the jury...." *State v. Singer*, 815 P.2d 1303, 1309 (Utah App. 1991). *Accord State v. Velarde*, 734 P.2d at 454. We conclude that the trial court did not err in denying defendant's post-conviction motion because sufficient evidence was presented from which the jury could have reached its verdict. The trial court did not abuse its discretion in deferring to the jury on the question of intent and refusing to reduce defendant's conviction.

## CONCLUSION

We find no error in the trial court's denial of defendant's motion to suppress the statements he made to police during the three pre-arrest interviews. We also find that the eyewitness identification procedure was a showup and therefore defendant's right to counsel was not violated. Additionally, we find that the trial court did not err in allowing evidence concerning Clarkson's out-of-court identification of defendant. We conclude the trial court did not err in excluding the negligent homicide lesser included offense instruction or in denying defendant's post-conviction motion. Accordingly, defendant's conviction is affirmed

Affirmed.

BENCH and ORME, JJ., concur.